416 F.2d 217
 7 A.L.R.Fed. 493
 Heinrich H. SCHAEFFER, Plaintiff-Appellee,
v.
MICHIGAN-OHIO NAVIGATION COMPANY, a Corporation;
Westinghouse Electric Corporation, a Corporation; Security
Fire Door Co., a Corporation; and Elevator Supplies Company,
Inc., a Corporation, Defendants-Appellants.
 No. 18901.
 United States Court of Appeals Sixth Circuit.
 Sept. 24, 1969.
 
 Albert A Miller, Detroit, Mich. (Garan, Lucow & Miller, Detroit, Mich., on the brief) for appellant Westinghouse Electric Corp.
 John A. Hamilton, Detroit, Mich. (Foster, Meadows & Ballard, Detroit, Mich., on the brief), for Sand Products Corporation.
 Leroy G. Vandeveer, Detroit, Mich. (Vandeveer, Doelle, Garzia, Tonkin & Kerr, Leroy G. Vandeveer, Detroit, Mich., on the brief), for Elevator Supplies Co., Inc.
 Konrad D. Kohl, Detroit, Mich. (Victor G. Hanson, Detroit, Mich., Arthur Roth, Miami, Fla., on the brief), for Security Fire Door Co.
 Davidson, Gotshall, Kelly, Halsey & Kohl, by Konrad D. Kohl, Detroit, Mich., Arthur Roth, Miami, Fla., for Heinrich H. Schaeffer.
 Before EDWARDS, CELEBREZZE[1] and COMBS, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 The accident which gives rise to this litigation took place on the Great Lakes cruise ship Aquarama which was en route from Cleveland to Detroit.
 
 
 2
 The first major question presented by this appeal is whether a products liability suit is recognized in admiralty law. If so, the second concerns whether the proofs justify the $200,000 judgment entered in favor of plaintiff-appellee, Heinrich H. Schaeffer, against defendant-appellant Westinghouse Electric Corporation after jury trial in the United States District Court for the Eastern District of Michigan. Other questions challenge the District Judge's dismissal of actions against two of the subcontractors of Westinghouse and his dismissal non obstante veredicto of Westinghouse's counter suit against Sand Products Corporation, the owner of the Aquarama.
 
 
 3
 Schaeffer was a handyman-mechanic on the Aquarama on September 1, 1962, when he suffered a severe injury which occasioned the amputation of a leg when the counterweight to the dumbwaiter on the Aquarama fell on him when he was engaged in seeking to remove the burned out electric motor which operated the dumbwaiter. Schaeffer sued every party arguably involved, including his employer, Michigan-Ohio Navigation Company (the charterer and operator of the Aquarama), Westinghouse (the general contractor on the installation and maintenance of the dumbwaiter), and Security Fire Door Company and Elevator Supplies Company (subcontractors on the installation of the dumbwaiter). Westinghouse in turn sued all defendants named above and Sand Products Corporation, owner of the Aquarama, for indemnity of any amount that might be found in damages in favor of Schaeffer against Westinghouse. Prior to trial Michigan-Ohio Ohio settled its Jones Act suit (46 U.S.C. 688 et seq. (1964) with Schaeffer for $78,241.23 and proceeded in this action to sue Westinghouse for indemnity in that sum.
 
 
 4
 The products liability claims of Schaeffer against Westinghouse asserted that Westinghouse as the contractor for construction and maintenance of the dumbwaiter was guilty of design negligence, negligence in failing to warn of a hidden danger, and breach of an implied warranty of safety. Schaeffer's design negligence claim was based primarily upon the fact that the access door for servicing of the dumbwaiter was placed on the side of the dumbwaiter shaft so that any employee who worked on the dumbwaiter motor would necessarily have a portion of his body underneath the counterweight. In the event the cables for any reason were disengaged from the pulleys, the counterweight could (and did) fall like a guillotine. It is also asserted that failure to have the cables secured or to have counterweights housed or 'buffered' against such possibility was likewise design negligence.
 
 
 5
 As to failure to warn, Westinghouse had a maintenance contract on this elevator so that they serviced it during the seven years of operation of the Aquarama and they knew of the burned out motor and that the Aquarama staff would be expected during a voyage to take the motor out for repairs. It is asserted that failure to warn at that point of the hazards of this operation concerning the possible fall of the counterweight when the motor was unbolted represented negligence likewise.
 
 
 6
 The claimed breach of warranty was a reiteration of the claims just stated in the context of Westinghouse's asserted implied warranty that the product they had supplied and maintained was safe to operate.
 
 
 7
 After counsel for Schaeffer completed his opening statement, Security Fire Door and Elevator Supplies moved for directed verdicts claiming that there were no facts stated by Schaeffer under which they could be held liable. The District Judge granted the motion after a colloquy in which Schaeffer's counsel and counsel for Westinghouse both appeared to agree that directed verdicts as to these two were proper. This concession is now disputed by present counsel for Westinghouse.
 
 
 8
 The case then proceeded through trial and the District Judge submitted the issues to the jury. The special questions and the jury answers to them and the Form of Verdict as filled out by the jury follow:
 
 
 9
 'THE FOLLOWING SPECIAL QUESTIONS APPLY ONLY TO THE ACTION BROUGHT BY HEINRICH SCHAEFFER AGAINST WESTINGHOUSE ELECTRIC CORPORATION
 
 
 10
 (Filed July 1, 1966)
 
 
 11
 '1. Did Westinghouse breach an implied warranty of fitness, if any, or was Westinghouse guilty of negligence, if any, that caused or contributed to Heinrich Schaeffer's injuries?
 
 Answer: Yes 0
 
 12
 No
 
 
 13
 (If your answer to Question No. 1 is 'No', then no further questions need be answered).
 
 
 14
 '2. Was Heinrich Schaeffer negligent and did such negligence, if any, cause or contribute to his injuries?
 
 Answer: Yes 0
 
 15
 No
 
 
 16
 '3. If your answer to Question No. 2 is 'Yes,' what percentage of the cause of the accident do you attribute to plaintiff's negligence, if any?
 
 
 17
 Answer: 33 1/3%
 
 
 18
 '4. What do you find to be the total dollar amount, if any, of plaintiff's damages: In reaching this amount, you are not to make any reduction for percentage of contributor's negligence, if any.
 
 Answer: $300,000
 
 19
 '5. Subtract the amount in dollars represented by your answer to No. 3 from your answer to No. 4.
 
 
 20
 Answer: $200,000''THE FOLLOWING SPECIAL QUESTIONS APPLY ONLY TO THE ACTION BROUGHT BY MICHIGAN-OHIO NAVIGATION COMPANY AGAINST WESTINGHOUSE ELECTRIC CORPORATION
 
 
 21
 (Filed July 1, 1966)
 
 
 22
 '1. Did Westinghouse fail to perform its contract to furnish and install and maintain an Elevator Supply dumbwaiter in a careful and workmanlike manner?
 
 Answer: Yes 0
 
 23
 No
 
 
 24
 '2. Did Michigan-Ohio prevent or seriously hinder Westinghouse in the performance of its contract to furnish and install and maintain an Elevator Supply dumbwaiter?
 
 Answer: Yes 0
 
 25
 No
 
 
 26
 '3. Did Westinghouse fail to perform its maintenance contract with Michigan-Ohio in a careful and workmanlike manner?
 
 Answer: Yes 0
 
 27
 No
 
 
 28
 '4. Did Michigan-Ohio prevent or seriously hinder Westinghouse in the performance of its maintenance contract?
 
 Answer: Yes
 
 29
 No '
 
 
 30
 'FORM OF VERDICT
 
 
 31
 'I. AS TO SCHAEFFER v. WESTINGHOUSE ELECTRIC CORPORATION
 
 
 32
 A. We find for the plaintiff Henry Schaeffer against Westinghouse Electric Corporation in the sum of $200,000.
 
 
 33
 or
 
 
 34
 B. We find no cause for action against the defendant-Westinghouse Westinghouse Electric Corporation. Yes
 
 
 35
 'II. AS TO MICHIGAN-OHIO NAVIGATION COMPANY v. WESTINGHOUSE ELECTRIC COMPANY
 
 
 36
 A. We find for the cross-plaintiff Michigan-Ohio Navigation Company against Westinghouse Electric Corporation in the sum of $0.
 
 
 37
 or
 
 
 38
 B. We find no cause for action against the defendant Westinghouse Electric Corporation. Yes 0
 
 
 39
 'III. AS TO WESTINGHOUSE ELECTRIC CORPORATION v. SAND PRODUCTS CORPORATION
 
 
 40
 A. We find for the third party plaintiff Westinghouse Electric Corporation against the third party defendant Sand Products Corporation in the sum of $78,241.23.
 
 
 41
 or
 
 
 42
 B. We find no cause for action against the third party defendant Sand Products Corporation. Yes 0'Subsequently, the District Judge directed a verdict for Sand Products, entered a judgment of no cause for action as to Michigan-Ohio's suit against Westinghouse and again submitted to the jury the question of Schaeffer's damages against Westinghouse. The jury thereupon returned a verdict of $200,000 damages in favor of Schaeffer against Westinghouse upon which the District Judge entered judgment. Westinghouse appealed.
 
 
 43
 It is, of course, settled law that Jones Act recovery by an injured seaman does not preclude his right to an action against a third party whom he alleges to have caused his injury. Ryan Stevedoring Co., Inc. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1955); Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Crawford v. Pope & Talbot, Inc., 206 F.2d 784 (3d Cir. 1953).
 
 
 44
 We believe that a products liability claim will lie in admiralty court. Sieracki v. Seas Shipping Co., 149 F.2d 98 (3d Cir. 1945), aff'd,328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Noel v. United Aircraft Corp., 342 F.2d 232 (3d Cir. 1965); Sanderlin v. Old Dominion Stevedoring Corp., 385 F.2d 79 (4th Cir. 1967). See also McCune, 'Maritime Products Liability,' 18 Hastings L.J. 831 (1967).
 
 
 45
 The historical difficulties inherent in deciding this question are many. They are illustrated by the United States Supreme Court majority and the dissenting opinions in Seas Shipping Co., Inc. v. Sieracki, supra, and in the Second Circuit opinion in Igneri v. CIE. de Transports Oceaniques, 323 F.2d 257 (2d Cir.), cert. denied, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1963). Neither of these cases, of course, dealt directly with products liability. But the history recited seems to indicate that admiralty law (albeit slowly) draws upon and incorporates the law prevailing on land when there is no historic (or statutory) principle to the contrary. Igneri v. CIE. de Transports Oceaniques, supra; Littlehale v. E. I. du Pont de Nemours & Co., 268 F.Supp. 791 (S.D.N.Y.1966), aff'd, 380 F.2d 274 (2d Cir. 1967).
 
 
 46
 We also read the lengthy history of Simpson Timber Co. v. Parks, 369 F.2d 324 (9th Cir. 1966), cert. granted, vacated, and remanded, 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319 (1967), 390 F.2d 353 (9th Cir. 1968), as an example of a products liability case within admiralty jurisdiction where the Supreme Court action implicitly recognized the validity of the cause of action. See also Sevits v. McKiernen-Terry Corp., 264 F.Supp. 810 (S.D.N.Y.1966); Montgomery v. Goodyear Tire & Rubber Co., 231 F.Supp. 447 (S.D.N.Y.1964), aff'd, Montgomery v. Goodyear Aircraft Corp., 392 F.2d 777 (2d Cir.), cert. denied, 393 U.S. 841, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968); Middlleton v. United Aircraft Corp., 204 F.Supp. 856 (S.D.N.Y.1960).
 
 
 47
 Appellants' next argument is that this record discloses no evidence upon which the District Judge could properly have submitted Schaeffer's claim of design negligence and breach of warranty against Westinghouse. We do not agree. We have previously described the placement of the access door which required any workman seeking to work on or replace the motor to place himself under the suspended counterweights. This design coupled was with two other facts: 1) Evidence showed that there was no buffer to keep the counterweights from falling free to the bottom of the shaft; 2) There was no guard or housing for the counterweight to prevent contact between it and any workmen. From these elements the jury could have concluded that something like a hidden trap had been built for the first unwary workman who sought to change the dumbwaiter motor, and that Schaeffer was that man.
 
 
 48
 Plaintiff called an expert in machine design to the stand. He testified in the following colloquy:
 
 
 49
 'Q. (By Mr. Hamilton)
 
 
 50
 'In your opinion, Professor, as an expert in machine design is it proper to have the access panel located under the counterweight on the same face?'
 
 
 51
 'THE COURT: 'I will take the answer."
 
 
 52
 'A. 'It is my opinion that where the counterweight is required to pass over the access panel it is extremely poor design.'
 
 
 53
 'Q. (By Mr. Hamilton) 'And why is that, Professor?'
 
 
 54
 'A. 'There is always the danger present of the counterweight falling past the access under several failure conditions, the possibility of rope breakage, the possibility of drive machinery coming loose, the possibility of the overhead supporting structure coming loose, any of which could allow the counterweight to fall. When the counterweight falls in front of the access there is always the possibility of a workman being present subject to injury."
 
 
 55
 The same witness testified that good design would require that the counterweight be housed or buffered in the interest of safety.
 
 
 56
 This evidence was not squarely contradicted in this record. Indeed, defendant Westinghouse's principal witness testified on cross examination that this was the only installation he knew of where the counterweights fell across the face of the access door.
 
 
 57
 It is also clear that the original blue prints for this dumbwaiter showed the access door placed on another side of the shaft where the counterweights would fall at the side rather than over the face of the door. Westinghouse offered no explanation of the change in location of the access door. The main thrust of the Westinghouse defense was expert witness testimony that the dumbwaiter was designed in accordance with the minimum safety standards of the industry at the time and that Schaeffer himself was negligent in failing to recognize the danger.
 
 
 58
 As to the industry safety standards, the District Judge properly instructed that the jury had a right to consider them in arriving at the verdict, but that they were not binding on the issue of negligence. Texas & Pacific Ry. Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905 (1903); The T. J. Hooper, 60 F.2d 737 (2d Cir.), cert. denied, Eastern Transport Co. v. Northern Barge Corp., 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932); Northwest Airlines, Inc. v. Glenn L. Martin Co., 224 F.2d 120, 50 A.L.R.2d 882 (6th Cir. 1955), cert. denied, 350 U.S. 937, 76 S.Ct. 308, 100 L.Ed. 818 (1956).
 
 
 59
 As to Schaeffer's negligence, Westinghouse's evidence obviously convinced the jury for they found Schaeffer contributorily negligent to the extent of one-third responsibility. But, of course, in admiralty court, contributorily negligent acts merely mitigate damages, rather than bar the claim. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).
 
 
 60
 The jury, of course, had a right to take all these facts into consideration in determining the negligence and breach of warranty claims against Westinghouse. On them the jury found Westinghouse either breached its warranty of safety or was guilty of negligence. It also found plaintiff Schaeffer guilty of negligence which contributed to causing the accident to the extent of 33 1/3%. It found damages of $300,000 and awarded $200,000.
 
 
 61
 We find on this record ample evidence to support the negligence or breach of warranty verdict. No issue is presented as to the amount of the verdict.
 
 
 62
 Westinghouse also cites as reversible error the District Judge's submission to the jury of Schaeffer's claim that Westinghouse was negligent in failing to warn of the danger involved in the removal of the burned out motor. It appears clear to us, however, that Westinghouse as the general contractor for building and maintenance of the dumbwaiter had peculiar knowledge of the hazards involved in its construction. Westinghouse's superintendent testified to the shoring measures he was contemplating in the event that he was required to send a crew aboard the Aquarama to remove the burned out motor. It is clear that he knew that the chief engineer of the Aquarama had decided to have the job done by one of the ship's handymen-mechanics while the ship was in transit. But Westinghouse's superintendent did not see fit to make any comment concerning the hazards of the operation or the methods to be employed to accomplish the removal safely. His explanation was that he felt it was an insult to give such a warning to a competent mechanic. However logical this explanation may be, we feel that it was appropriate for consideration of the jury on this issue. We are unpersuaded that the District Judge's charge constituted reversible error.
 
 
 63
 The dismissal of co-defendants Security Fire Door and Elevator Supplies seemed appropriate to the District Judge at the close of the opening statements-- and it does to us now. No party offered to prove (or did prove) that either subcontractor ever knew that the access door change was intended or actually made.
 
 
 64
 As to Westinghouse's suit for indemnity against Sand Products Corporation, the jury verdicts were completely contradictory. The jury found for Westinghouse in the sum of $78,241.23 and 'no cause for action' against defendant Sand Products. Normally, this would call for retrial between the parties. On Sand Products' motion for verdict non obstante veredicto, however, the District Judge held (and we agree) that this trial record would not have supported a verdict. Sand Products chartered the Aquarama to Michigan-Ohio Navigation Company on a bare boat charter. Generally, as to injured seamen such a charterer steps into the shoes of the shipowner. Reed v. The Yaka,373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). The record simply does not offer proof from which the jury could appropriately have found Sand Products responsible for the dumbwaiter design or construction.
 
 
 65
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 Judge Celebrezze did not participate in the decision of this case