**CHOTIN TRANSPORTATION, INC., Plaintiff-Appellant, Cross-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellee, Cross-Appellant.**

Nos. 84–5652, 85–5138.

United States Court of Appeals, Sixth Circuit.

Reargued Nov. 12, 1986.

Decided June 5, 1987.

Frank S. Thackston, Jr. (argued), Lake, Tindall, Hunger & Thackston, Greenville, Miss., C.W. Walker, III, for plaintiff-appellant, cross-appellee.

Robert V. Smyth, II, U.S. Army, Nashville Dist., Corps of Engineers, Nashville, Tenn., Thomas L. Jones (argued), Deborah Kant, Michael Jay Singer, Dept. of Justice, Civil Div., Washington, D.C., for defendant-appellee, cross-appellant.

Before LIVELY, Chief Judge, ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, KRUPANSKY, WELLFORD, MILBURN, GUY, NELSON, RYAN, BOGGS and NORRIS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

The plaintiff-appellant Chotin Transportation, Inc. (Chotin) appealed, and the defendant-appellee United States of America (government) cross-appealed from the district court's order awarding the United States $136,374.51 in damages plus pre-judgment interest in this admiralty action commenced pursuant to the Suits in Admiralty Act (SIAA), 46 U.S.C. §§ 741–752.

The record disclosed the following facts, which were not in dispute. On January 20, 1982, the Chotin tug M/V Francis R. Keegan, Barge Chotin 1794, and Barge Chotin 3390, were moving upstream on the Tennessee River which required passage through the Wilson Lock. The lock is the property of the United States and is operated by the Army Corps of Engineers, an instrumentality of the United States. Barge 3390 was the lead barge followed by Barge 1794 and the tug. The barge train reached the lock on the evening of January 20 during deteriorating weather conditions with restricted visibility occasioned by a dense fog and heavy rain.

The captain and pilot of the tug, Paul Horton (Horton), radioed Ivan Wallace (Wallace), the single lock operator on duty that night, for permission to enter the lock. Horton advised Wallace that the flotilla was 586½ feet in length, whereupon Wallace opened the 600 foot lock's downriver "miter" [1] gates and authorized Horton to move the flotilla into the lock chamber.

The barge train was maneuvered into the lock and placed along the lock chamber's river wall on the starboard side of the tug and barges. Wallace, who was in the lock's lower land wall control station, then instructed Horton to move the flotilla to the land wall on the port side of the vessels. Horton complied, and the vessels were brought to a stop four to five feet from the upper "lift" [2] gate which afforded sufficient clearance to close the downriver

miter gates, and in the judgment of the tug's crew, provided adequate distance for the bow of the lead barge, Chotin 3390, to clear the upriver lift gate. The tug's crew secured the tug and barges to the land wall. Lines were connected from "floating mooring bits" [3] on the chamber wall to deck fittings on the vessels to prevent forward and backward movement of the barge train within the lock. After both lines had been secured, and the tug's throttles had been placed in the neutral position to equalize the stress on both lines, Horton reported to Wallace that the tug and its barges had been "tied-off" on the land wall of the chamber.

Wallace had observed the stern of the tug and the crew as it secured the flotilla from a distance of approximately 90–100 feet from the lower land wall control station. Convinced that the flotilla had been secured to permit the downstream miter gates to close, Wallace closed the gates. At that point in time the tug and barges could have been moved astern to permit a greater clearance between the head of the flotilla and the upstream lift gate once the downstream miter gates were closed. Horton, however, left the vessels secured as they had been initially tied off along the chamber land wall.

By the time the downstream miter gates had been closed, the fog had become more dense, and, as a result of the reduced visibility, Wallace could no longer view the mooring lines nor the clearance between the flotilla and the upstream lift gate. Wallace nevertheless opened the lock's intake valves from the lower land wall control station permitting water to enter the chamber.

After he had opened the valves, he walked along the land wall to examine the mooring lines, but was unable to do so because of the dense fog. Wallace thereupon proceeded, via motor scooter, to the

---

1. A "miter" gate is a hinged wing gate that opens into the lock chamber and is flushed into the chamber walls when in the fully open position.

2. A "lift" gate opens by moving upward within its tracks situated on each wall of the lock chamber.

3. "Floating mooring bits" are floating tanks in the lock wall which allow the flotilla's lines to rise and fall with the water level in the lock.

lock's main operations building which was situated between the downriver and upriver control stations where he obtained a newspaper for the tug's crew. He thereafter continued to the second mooring bit approximately 126 feet downriver from the upstream lift gate. The mooring lines were not visible at that position so he proceeded to the first mooring bit approximately 54 feet downriver from the upstream lift gate. The mooring lines were still not visible so he decided to close the intake valves and stop the flow of water into the lock. To implement this decision he proceeded to the upper land wall control station where additional control valves were located, but because of his haste in attempting to enter the station, he experienced time-consuming difficulty in positioning his key to turn the lock to gain entry into the facility.

During the time Wallace was travelling from the lower to the upper land wall control stations, the flotilla experienced two episodes of "surging" which caused the flotilla to move forward and backward in the lock chamber. The first surge occurred when water was initially introduced into the lock. During that episode, a crew member retied the towing line to remove slack, and Horton engaged the tug's starboard engine astern to hold the flotilla in place. The surging stopped as the flow of water into the chamber stabilized and the water level continued to rise. After the surging had ceased, the tug's crew checked the clearance between the bow of Barge 3390 and the upstream lift gate and erroneously concluded that its bow would clear the gate.

Approximately eight minutes later, the second episode of surging occurred when the water intake valves automatically increased the water flow into the chamber. The second surging continued for approximately six to eight minutes. Horton failed to advise Wallace of either incident.

When the water level in the lock had raised the barge train to within a few feet below the upstream lift gate, the tug's first mate realized that the bow of Barge 3390 would collide with the gate. Another crew member reported that impact was imminent. The first mate radioed Horton of the danger, and Horton engaged the tug's engines astern in an effort to back-off the flotilla from the upstream lift gate. He then radioed Wallace to close the water intake valve; however, the impact was unavoidable. The bow of the Barge 3390 struck the upstream lift gate, and, as the water continued to rise, became wedged under the gate causing the coupling between Barge 3390 and Barge 1794 to break and the bow rake of Barge 3390 to disconnect, damaging the lock chamber and the barge.

Chotin commenced this action under the SIAA, 46 U.S.C. §§ 741-752, in the United States District Court for the Middle District of Tennessee, wherein it alleged that the negligent operation of Wilson Lock by the government caused damage to its Barge 3390. The government counterclaimed against Chotin for negligence which caused damage to the upstream lift gate, and in a related third-party *in rem* action charged the tug Keegan, Barge 1794, and Barge 3390 with negligence that resulted in damage to the same upstream lift gate. The third-party *in rem* action was initiated pursuant to the Rivers and Harbors Act, 33 U.S.C. §§ 408 and 412. The parties stipulated their respective monetary damages. At the conclusion of a bench trial, the government dismissed its *in personam* negligence claim and elected to proceed on its *in rem* action against Chotin.

The trial court, having invoked maritime comparative negligence principles in considering Chotin's claim against the government, concluded that each was 50% negligent in causing the collision between Barge 3390 and the upstream lift gate. The court decided that the government was negligent because Wallace had breached his duties as lockmaster to control and manage the lock and to supervise the mooring operations of the barge train adequately, *see* 33 C.F.R. § 207.300, and that Chotin was negligent in failing to operate the tug and barges properly while the flotilla was in the lock. The court thereupon assessed 50% of Chotin's damages to Barge 3390 against the govern-

ment. In addressing the government's *in rem* claim against Chotin, the court determined that the *in rem* third-party defendants were strictly liable to the United States under 33 U.S.C. §§ 408 and 412 for the total damage to the upstream lift gate. Judgment was entered for the government for a net recovery of $136,374.51 plus prejudgment interest.

Chotin thereupon timely appealed that part of the district court's judgment which held it to be liable for the total amount of the damage to the upstream lift gate of the lock, and the government cross-appealed that part of the district court's judgment which imposed 50% liability against it for the damages to Barge 3390. A panel of this court affirmed the district court's decision which assessed 50% of the damages to Barge 3390 against the United States, but reversed that part of the judgment which concluded that the *in rem* third-party defendants were strictly liable for the damages to the upstream lift gate. *Chotin Transp., Inc. v. United States*, 784 F.2d 206 (6th Cir.1986). Upon the motion of the government for reconsideration, this court vacated the panel's decision, 793 F.2d 136 (6th Cir.1986), and assigned the case for en banc rehearing.

On the initial appeal to this court, the government had argued that Wallace's negligent acts were within the perimeters of the discretionary exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a). The panel unanimously agreed that the exemption did not apply because a factual analysis disclosed that the lockmaster's breach of duty had not resulted from a policy judgment or policy decision implicit to invoking the exemption as intended by Congress.

The government's reliance upon *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660, *reh'g denied*, 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984), to support its application of the discretionary exemption to the facts of this case was misplaced. *Varig Airlines* reaffirmed the Court's earlier interpretation of § 2680(a) articulated in the

seminal case of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), *reh'g denied*, 347 U.S. 924, 74 S.Ct. 511, 98 L.Ed. 1078 (1954). In *Varig Airlines* the Supreme Court recognized that:

> As in *Dalehite*, it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exception.

467 U.S. at 813, 104 S.Ct. at 2765.

Having made that pronouncement, the Supreme Court proceeded to define the criteria against which the facts of any given case should be compared in resolving the protection afforded by the discretionary exemption imposed by the Federal Tort Claims Act, 28 U.S.C. § 2680(a), by stating:

> From the legislative and judicial materials, however, it is possible to isolate several factors useful in determining when the acts of a Government employee are protected from liability by § 2680(a). First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. As the Court pointed out in *Dalehite*, the exception covers "[n]ot only agencies of government ... but all employees exercising discretion." 346 U.S., at 33, 73 S.Ct., at 966. Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.
>
> Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.

*Id.* at 813–14, 104 S.Ct. at 2764. The inexhaustible line of citations relied upon by the government in its initial appeal simply emphasized the ad hoc application of facts to the *Varig Airlines* criteria to identify the exception.

Enjoining the dictates of *Varig Airlines* upon the developed facts of the instant case, this en banc court concludes that the

lockmaster's negligence on the night of January 20, 1982 did not involve executive and/or administrative decisions anchored in social, economic, and political policies of the kind that Congress intended to safeguard from judicial second-guessing. In the case at bar, the government had exercised its policy by promulgating regulations to ensure the safe passage of vessels during the locking procedures. It was the lockmaster's negligent performance in ignoring the government's regulations that gave rise to the government's negligence in causing damage to Chotin's barge.

■ The government's attenuated interpretation of *Varig Airlines* would have this court extend the discretionary exemption, without exception, to all governmental activities undertaken by governmental employees under circumstances involving the exercise of judgment. In noting that pragmatically all negligent conduct, to a greater or lesser degree, is the product of a voluntary election to perform or not perform an act, this en banc court observes that the government's suggested interpretation would confer the discretionary exception on all governmental activities and conduct that permitted or required the exercise of an election or option, which interpretation would be in derogation of the congressional intent incorporated into the FTCA and SIAA. In *General Pub. Util. Corp. v. United States*, 745 F.2d 239, 245 (3d Cir. 1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1986), a post-*Varig Airlines* case, the Third Circuit demonstrated its understanding of *Varig Airlines*:

> The exemption from the Tort Claims Act is based on the nature of the governmental discretionary function, not whether there is an option to choose. Regulatory activities are within the exemption, not because alternatives exist in particular circumstances, but because of the fundamental character of the role assigned to the agency.

Likewise, in *Canadian Transp. Co. v. United States*, 663 F.2d 1081 (D.C.Cir. 1980), the D.C. Circuit recognized the existence of a discretionary function exception in the SIAA:

> The government appears to argue that if an action involves the exercise of judgment by a government employee, the action is discretionary and the United States is immune from suit.... Courts have recognized, however, that giving such a broad reading to the term "discretionary" would effectively immunize almost all government activity from suit under the FTCA.

663 F.2d at 1086. The government's proposed interpretation would effectively eviscerate the legislative intent reflected in the FTCA and the SIAA. In the case at bar, the lockmaster abdicated his duties to immediately control and manage the locking procedure; to supervise the mooring of the barge train in the lock; to supervise the tying of the backing and towing lines during lockage; to check the clearance between the head of the flotilla and the upstream lift gate after the captain of the Keegan informed him that the flotilla had been secured in the chambers; to discontinue the locking procedure when it was obviously dangerous; and to stop the flow of water into the chamber to prevent the disaster because he was unable to enter expeditiously the upper control station in time to close the necessary valves. Accordingly, this court concludes that the lockmaster's conduct did not fall within the discretionary exception of the FTCA as urged by the government on this appeal.

■ The record further disclosed that the crew of Chotin's tug Keegan was also negligent. No crew member monitored the slack in the mooring lines or the distance between the bow of Barge 3390 and the upstream lift gate until a time after which the accident was unavoidable. The crew failed to monitor the lift of the barge train constantly in light of the critical clearances between the flotilla and the chamber walls during the progress of the lift and during the anticipated severe surges associated with the introduction of water into the chamber to accomplish the hydraulics of the lift. Accordingly, the district court's decision that the government and Chotin were each 50% negligent in causing the

**1348**

collision here in issue and the trial court's determination that under maritime comparative negligence principles the government was liable to Chotin for 50% of the damage to Barge Chotin 3390 is AFFIRMED.

The same maritime comparative negligence principles do not, however, apply in allocating the parties' liability for the damage to the upstream lift gate. This court's attention is accordingly directed to the relevant sections of the Rivers and Harbors Act, 33 U.S.C. §§ 408 and 412, which allocated liability under circumstances analogous to those developed by the evidence in the case at bar. 33 U.S.C. §§ 408 and 412 provide, in pertinent part, that:

> It shall not be lawful for any person or persons to ... alter, deface, destroy, move, injure, ... *or in any manner whatever impair the usefulness* of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, *or other work* built by the United States ... for the preservation and improvement of any of its navigable waters or to prevent floods....

33 U.S.C. § 408 (emphasis added).

> And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft ... and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof.

33 U.S.C. § 412.

In *Hines, Inc. v. United States*, 551 F.2d 717, 724 (6th Cir.1977), a case factually parallel to the instant case, this Circuit unequivocally announced that "Section 408 imposes strict liability, as compared to § 409's requirement of negligence. Section 412 also provides that 'any boat, vessel ... or other craft used or employed in violating any of the provisions of sections ... 408 ... of this title shall be liable for ... the amount of the damages done by said boat,

vessel ... or other craft....'" *See also United States v. Tug Colette Malloy*, 507 F.2d 1019 (5th Cir.1975).

*Hines, Inc.* thereupon proceeded to adopt favorably the Seventh Circuit's rationale enunciated in *United States v. Ohio Valley Co.*, 510 F.2d 1184 (7th Cir.1975):

> [T]he purpose of the combined effect of sections 14 and 16 [33 U.S.C. §§ 408 and 411] is to provide funds for the replacement and maintenance of improvements built by the United States. This purpose is implemented through an absolute liability standard. Thus, it would be wholly inconsistent to apply the limitation of liability provisions of section 183(a) to the absolute liability provisions of section 14, while at the same time not applying them to section 15 (wreck statute) [33 U.S.C. § 409] which speaks in terms of "voluntarily or carelessly" allowing a vessel to sink. Furthermore, section 183(a) speaks in terms of lack of "privity and knowledge." That phrase implies that the owner be unaware of the fault in his vessel that caused an accident. Since the triggering mechanism for section 183(a) limitation of liability is tied to an awareness of negligence, and because negligence is not significant in actions under sections 14 and 16, it follows that the limitation of liability provisions are inapplicable to those sections.

*Id.* at 1188 (footnote omitted).

The pronouncements of the Seventh Circuit in *United States v. Ohio Valley Co.* and the Sixth Circuit's resolution of *Hines, Inc. v. United States* were echoed by the Eighth Circuit in *United States v. Federal Barge Lines, Inc.*, 573 F.2d 993 (8th Cir. 1978), wherein that court further analyzed the purpose of the Rivers and Harbors Act, 33 U.S.C. §§ 408 and 412:

> The purpose of the Act is to protect, preserve, and make safe the Nation's navigable waterways, and the United States is the principal beneficiary of the Act. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379 [385], 19 L.Ed.2d 407 (1967). The Act should be construed broadly to effectuate its goals. *Wyandotte Transporta-*

*tion Co. v. United States, supra; United States v. Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). Congress imposed strict liability under sections 408 and 412 in order to provide funds for the replacement and maintenance of improvements made by the United States; to interpret those sections in such a way as to limit liability would be inconsistent with the intention of Congress.

573 F.2d at 997. *See also United States v. Logan & Craig Charter Service, Inc.,* 676 F.2d 1216 (8th Cir.1982)

As early as 1906, the First Circuit laid to rest challenges to the Rivers and Harbors Act in *New England Dredging Co. v. United States,* 144 F. 932, 933 (1st Cir.1906), wherein it elaborated on the purposes underlying the congressional promulgation when it explained:

> If the view of the United States is upheld, it is by virtue of the modern body of law, existing in this country, as well as in England, which is founded upon the arbitrary but necessary police power inherent in government, rather than upon general principles which govern in other cases.

> This exceptional rule, founded largely upon statutes enacted for the enforcement of the plenary power in government is recognized as applying to ... a variety of conditions relating to the public health and public good.

> As to wrongs within this rule, the penalty is supposed to attach to the offending act without regard to the question of willfulness or intent, and without regard to the question of mistake or innocence. The rule is, of course, in derogation of the principles of the common law, and its

drastic quality is justified upon grounds of necessity, and as in the interest of the public good.

> The expressed object of resorting to the exercise of plenary power through arbitrary and exceptional remedies in such matters, is to better safeguard the public good in situations where the public good is easily subject to imposition and injury through heedless, inadvertent, or indifferent violations of laws enacted for the general welfare....

■ Thus, because strict liability under 33 U.S.C. §§ 408 and 412 of the Rivers and Harbors Act arises from a violation of the above statutes and not from common law tort negligence, and because the trial court properly assessed 50% of the liability proximately contributing to the damage of the upstream lift gate of the Wilson Lock on the Tennessee River against Chotin, it must, pursuant to the mandate of the statutory language, reimburse the government for the entire cost of the damage to the described lift gate.[4]

The Supreme Court's decision in *United States v. Reliable Transfer, Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), does not mandate a different result. First, this Circuit found no conflict with its pronouncement that "[s]ection 408 imposes strict liability," *Hines,* 551 F.2d at 724, and the mandate of *Reliable Transfer,* which had been decided two years earlier. Second, the Court in *Reliable Transfer* did not apply comparative negligence principles in abrogation of a statute which imposed strict liability. Instead, the Court held

> that when two or more parties have contributed by their fault to cause property damage *in a maritime collision or*

---

**4.** This decision does not suggest, as implied by the dissent, that the owner of a vessel involved in damaging a navigable water improvement must reimburse the government for the damage under circumstances where the government was 100% at fault. Two circuits which addressed that issue have concluded that the offending vessels may escape liability by showing that the government was 100% at fault. *See Tug Colette Malloy,* 507 F.2d at 1022; *United States v. Central Soya, Inc.,* 697 F.2d 165, 169 n. 4 (7th Cir.1982). That controversy is not joined by the facts of this appeal since the district court as-

sessed 50% of the liability proximately contributing to the damage of the upstream lift gate of the Wilson Lock to both Chotin and the government. Accordingly, this en banc court does not consider or decide the degree of negligence, if any at all, that must be attributable to "any person or persons [who] ... alter, deface, destroy, move, injure, ... or in any manner whatever impair the usefulness of ..." any improvement made by the United States to any of its navigable waters in violation of §§ 408 and 412 before invoking the strict liability of these sections.

*stranding*, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault....

421 U.S. at 411, 95 S.Ct. at 1716 (emphasis added). Maritime cases involving collisions at sea and strandings are governed by common law rules of admiralty which the Supreme Court was free to modify. As the Court stated in *Reliable Transfer*, " '[C]ongress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law.' No statutory or judicial precept precludes a change in the rule of divided damages...." 421 U.S. at 409, 95 S.Ct. at 1715 (citations omitted). In contrast, the instant case involves neither a "collision" nor a "stranding" as those terms are used in admiralty law. Rather, this case is controlled by the Rivers and Harbors Act which imposes strict liability in allocating damages against a private party who violates the pertinent sections of the Act. Therefore, the *Reliable Transfer* decision is not applicable to the instant case.

■ Congress has made the government the principal if not the sole beneficiary of the Rivers and Harbors Act by assessing vessels, persons, or corporations with the entire amount of the damage to navigable improvements owned or controlled by the government which damage was proximately caused by their acts. This court cannot, as suggested by the dissent, ignore the Congressional mandate.[5] Accordingly the

---

5. The Achilles' heel of the dissent is its failure to distinguish the term "strict liability" as it has evolved in products liability actions from the term as used in construing §§ 408 and 412 of the Rivers and Harbors Act.

Although the legal doctrine of strict liability in a products liability case does not impose absolute liability, it is generally characterized as liability without fault because there is no burden placed upon the plaintiff to prove negligence to impose liability since negligence is not an issue. The issue in a strict liability products case is not the *degree of care* exercised in the design and/or manufacture of the product but, rather, whether the product, when placed into the stream of commerce, was reasonably safe for its intended use in its intended environment as impliedly warranted by the manufacturer. Conversely, in the case at bar, this court is not confronted with a cause of action which arises pursuant to the doctrine of strict liability which has evolved in products liability actions from principles of common law tort, but rather with liability imposed from a violation of a statutory enactment by Congress as memorialized in §§ 408 and 412 of the Rivers and Harbors Act. Every circuit that has interpreted §§ 408 and 412 of the Act, including this Circuit, has determined that it was the congressional intent *not to limit the liability* of a vessel and/or owner for damage to a navigable improvement to any amount less than the total amount of the damage that resulted from the incident.

A cursory examination of the cases relied upon by the dissent discloses that they do not provide support for its arguments or conclusions. In *United States v. Central Soya, Inc.*, 697 F.2d 165, 169 n. 4 (7th Cir.1982), the primary issue was the applicability of the three-year statute of limitations, 28 U.S.C. § 2415(b), to actions initiated by the government pursuant to the Rivers and Harbors Act. The decision in that case simply concluded that such actions were founded in tort and thus a three-year tort statute of limitations applied. Worthy of note in the court's opinion is the language which interpreted § 408:

> In all actions brought pursuant to this statute, a defendant-vessel is liable if it is shown that the vessel has been the cause of the violation of § 408. There is no requirement that negligence be shown as the statute has been interpreted to be one of strict liability.

*Id.* at 168 (emphasis added) (citations omitted). The case did not address the application of comparative fault principles to actions initiated pursuant to the Rivers and Harbors Act.

*Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129 (9th Cir.1977), was a strict liability action wherein the plaintiff sought to recover damages for injuries allegedly caused by a defectively designed and/or manufactured oil filter which purportedly caused a fire in the engine room of a vessel. The plaintiff included in its complaint a claim for a breach of implied warranty charging that the oil filter was not free from defect and consequently not reasonably fit and/or safe for its intended use within the environment of its intended use, which pleading was typical of a stereotype strict liability products action. The court applied the comparative fault doctrine to the strict liability claim noting that "we have [no] ... statute or other state law to interpret and apply." *Id.* at 1138 n. 5. Obviously, the Rivers and Harbors Act was not involved in the action. Similarly, *Lewis v. Timco, Inc.*, 716 F.2d 1425 (5th Cir. 1983) (en banc), was a products liability case involving injuries which purportedly resulted from defectively designed and/or manufactured hydraulic tongs used on an off-shore oil rig wherein the Fifth Circuit Court of Appeals unequivocally announced that "[i]n maritime tort cases courts traditionally apply principles of maritime law, as informed by common law tort developments, *unless a policy determination has been made by the Congress.*" *Id.* at 1427 (em-

district court's determination that Chotin was strictly liable to the United States for damages to Wilson Lock's upstream gate is AFFIRMED.

For the reasons stated herein, the judgment of the district court awarding the United States $136,374.51 in damages plus prejudgment interest is hereby AFFIRMED.

MILBURN, Circuit Judge, concurring in part and dissenting in part. KEITH, MERRITT, BOYCE F. MARTIN, Jr., and NATHANIEL R. JONES, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge, joining.

We concur with the majority in affirming the district court with regard to its holding as to the damages suffered to Chotin's barge No. 3390. However, we respectfully dissent as to the majority's holding in favor of the government on its claim against Chotin for the damages done to the upstream miter gate at the Wilson Dam lock. We dissent because we believe that section 16 of the Rivers and Harbors Appropriation Act of 1899 ("the Act"), 33 U.S.C. § 412 ("section 412"), which renders private parties strictly liable for any injury caused to government-constructed river and harbor improvements, permits application of comparative fault where the government's own negligence contributes to its injury.

The starting point in interpreting a statute is the language itself. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Donovan v. Southern California Gas Co.,* 715 F.2d 1405, 1407 (9th Cir.1983) (per curiam); *Securities and Exchange Commission v. Ambassador Church Finance/Development Group, Inc.,* 679 F.2d 608, 611 (6th Cir.1982); *United States Lines, Inc. v. Bal-*

phasis added) (citations omitted). Again, the Rivers and Harbors Act was not involved. In *Murray v. Fairbanks Morse,* 610 F.2d 149 (3d Cir.1979), a nonmaritime case, the Third Circuit applied the Virgin Islands comparative fault statute, 5 V.I.C. § 1451, in determining that the doctrine applied in strict liability products actions. Thus, that court was confronted with a legislative mandate completely opposite to the mandate which this court must address.

The court in *Theriot v. J. Ray McDermott & Co.,* 742 F.2d 877 (5th Cir.1984), merely held that "a Jones Act [46 U.S.C. § 688] defendant must bear the responsibility for his negligence if such negligence played any part, *even the slightest,* in producing the injury...." *Id.* at 881 (emphasis in original) (citations omitted). Neither the Rivers and Harbors Act nor any section thereof was at issue in that matter. Furthermore, cases which apply comparative fault principles under the Jones Act cannot be considered analogous to the case at bar. The Jones Act, 46 U.S.C. § 688, imposes comparative fault principles by congressional enactment in the following express terms:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, ... and in such action *all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply....* *Id.* (emphasis added). Section 3 of the Federal Employers' Liability Act, 45 U.S.C. § 53, modifies the common law in cases of personal injury to railroad employees, *Tiller v. Atlantic Coast Line R.R. Co.,* 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610 (1943), and provides, in part:

In all actions ... brought against [a] ... common carrier by railroad ... to recover damages for personal injuries to an employee, ... the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but *the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee....* (emphasis added). The Jones Act is not remotely analogous to the Rivers and Harbors Act. They are two separate, distinct, and unrelated statutory enactments. Thus, the application of comparative fault principles in Jones Act cases, *as mandated by Congress, Roy Crook and Sons, Inc. v. Allen,* 778 F.2d 1037, 1040 (5th Cir.1985), is hardly surprising. The case at bar, however, confronts this court with a contrary congressional mandate, i.e., the imposition of strict liability against vessels used or employed in damaging the United States' navigable improvements pursuant to a specific direction of Congress.

*Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); and *Hlodan v. Ohio Barge Line, Inc.,* 611 F.2d 71 (5th Cir.1980), included "general claim[s] of negligence and unseaworthiness," *Hlodan,* 611 F.2d at 73, under "general maritime law" brought by private individuals against vessel owners for personal injuries. The government was not a party, and neither the Rivers and Harbors Act nor any section thereof was at issue in those cases. Here again, the "general maritime law" claims in those cases were not controlled by congressional enactments even remotely similar to the Rivers and Harbors Act.

*dridge,* 677 F.2d 940, 944 (D.C.Cir.1982). Section 14 of the Act, 33 U.S.C. § 408 ("section 408"), provides that it is unlawful to "alter, deface, destroy, move, injure ... or ... impair the usefulness of any ... work built by the United States ... for the preservation and improvement of any of its navigable waters...." Section 412 provides that "any boat, vessel, scow, raft, or other craft used or employed in violating ... section[ ] ... 408 ... shall be liable ... for the amount of the damages done by said boat, vessel, scow, raft, or other craft...."

The literal language of section 412 makes clear that private parties are strictly liable for any damage caused by their violation of section 408. *See United States v. Central Soya, Inc.,* 697 F.2d 165, 169 n. 4 (7th Cir.1982); *United States v. Logan & Craig Charter Service,* 676 F.2d 1216, 1219 (8th Cir.1982); *United States v. Federal Barge Lines, Inc.,* 573 F.2d 993, 997 (8th Cir.1978); *Hines, Inc. v. United States,* 551 F.2d 717, 724 (6th Cir.1977); *United States v. Ohio Valley Co.,* 510 F.2d 1184, 1186 (7th Cir.1975); *United States v. Tug Colette Malloy,* 507 F.2d 1019, 1022 (5th Cir. 1975); *United States v. M/V Martin,* 313 F.2d 851, 853 (7th Cir.1973). Strict liability "means liability that is imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care, i.e., actionable negligence." W. Prosser & W. Keeton, *The Law of Torts* § 75, at 534 (5th ed. 1984); *see also Birchfield v. International Harvester Co.,* 726 F.2d 1131, 1135 (6th Cir.1984) (strict liability, by definition, is unconcerned with the negligence or other culpable behavior of the defendant); *Kehm v. Procter & Gamble Manufacturing Co.,* 724 F.2d 613, 620 (8th Cir.1983) (under strict liability regime, the defendant can be held liable even though he was not negligent); *Smith v. Fiat-Roosevelt Motors, Inc.,* 556 F.2d 728, 730 (5th Cir.1977) (strict liability removes the burden of proving that the defendant was negligent).

The majority, however, rejects this well-settled definition of strict liability, holding that section 412 imposes strict liability but declining to decide whether liability under section 412 requires proof of negligence. The majority's inexplicable definition of strict liability finds no support in the decisions interpreting section 412, which have, without exception, defined strict liability as simply relieving the government of the burden of showing negligence. *See Central Soya,* 697 F.2d at 168 ("There is no requirement that negligence be shown as the statute has been interpreted to be one of strict liability."); *Logan & Craig Charter Service,* 676 F.2d at 1220 (sections 408 and 412 impose strict liability and require no showing of negligence); *Hines,* 551 F.2d at 724 ("Section 408 imposes strict liability, as compared to § 409's requirement of negligence."); *Ohio Valley Co.,* 510 F.2d at 1186 (sections 408 and 412 do not require proof of negligence); *M/V Martin,* 313 F.2d at 852–54 (liability under section 408 is not predicated upon negligence); *New England Dredging Co. v. United States,* 144 F. 932, 933 (1st Cir.1906) (liability under section 408 is imposed "without regard to the question of willfulness or intent, and without regard to the question of mistake or innocence"); *United States v. The Republic No. 2,* 64 F.Supp. 373, 377 (S.D.Tex. 1946) (liability imposed under section 408 even though there was no negligence shown); *The Gansfjord,* 25 F.2d 736, 737 (E.D.La.1928) (liability under section 408 does not require proof of negligence), *aff'd, Aktieselskabet Dampskib Gansfjord v. United States,* 32 F.2d 236 (5th Cir.), *cert. denied,* 280 U.S. 578, 50 S.Ct. 32, 74 L.Ed. 629 (1929).

While the language of section 412 imposes strict liability for violations of section 408, the mere imposition of strict liability, as defined by the decisions interpreting section 412, does not preclude application of comparative fault where the government's own negligence contributes to its injury. "[W]hile section 412 is a statute of strict liability, it is not one of absolute liability.... [A]n offending vessel may escape fault if it can prove that the collision resulted from the fault of the Government, which is a typical defense in tort." *Central*

*Soya,* 697 F.2d at 169 n. 4; *see also Tug Colette Malloy,* 507 F.2d at 1022 (court reasoned that if the defendant had shown that the government was at fault in causing the accident a defense would have been established); *United States v. P/B STCO 213,* 569 F.Supp. 743, 744 (S.D.Tex.1983) (court noted that section 412 imposes strict liability but not absolute liability), *rev'd on other grounds,* 756 F.2d 364 (5th Cir.1985); *Rebel Towing Co. v. United States,* No. 64–H–67, slip op. at 13 (S.D.Tex., March 3, 1965) (court refused to permit government to recover where the government was at fault in causing the accident).

Where the language of a statute is not dispositive, a court must interpret the statute in accordance with the objective the legislature sought to achieve. *See Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983); *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). The objective to be achieved by section 412's imposition of strict liability is to insure that the full costs of injuries caused by private parties to river and harbor improvements are borne by private parties and not the government. In *Federal Barge Lines,* the court explained:

> The purpose of the Act is to protect, preserve, and make safe the Nation's navigable waterways, and the United States is the principal beneficiary of the Act.... Congress imposed strict liability under sections 408 and 412 in order to provide funds for the replacement and maintenance of improvements made by the United States....

573 F.2d at 997 (citations omitted); *see also Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 201, 88 S.Ct. 379, 385,

19 L.Ed.2d 407 (1967); *Logan & Craig Charter Service,* 676 F.2d at 1219.

Application of comparative fault does not impede achievement of this objective nor erode the government's strict liability remedy. Comparative fault focuses attention on damages, not liability, and allocates damages between the parties who are responsible for the injury. W. Prosser and W. Keeton, *supra,* § 67, at 470. The objective of section 412 remains intact when comparative fault is applied because private parties remain strictly liable for any injury caused by their conduct except that the award of damages will be reduced in proportion to the government's causal contribution to its injury.[1] *Cf. Timco,* 716 F.2d at 1430 (court reasoned that policy reasons underlying strict products liability are not undermined by application of comparative fault since manufacturer is still strictly liable for all the harm caused by a defective product, except that caused by the consumer's own conduct); *Pan-Alaska Fisheries,* 565 F.2d at 1139 ("It comes down to this: the defendant is strictly liable for the harm caused from his defective product, except that the award of damages shall be reduced in proportion to the plaintiff's contribution to his own loss or injury.").

Absent contrary legislative intent, "federal courts interpret federal statutes as consistent with existing law, of which common law principles are a part." *Tarlton v. Saxbe,* 507 F.2d 1116, 1122 n. 14 (D.C.Cir. 1974); *see also United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 1794–95, 85 L.Ed.2d 64 (1985); *United States v. Monasterski,* 567 F.2d 677, 682 (6th Cir.1977). Because the government's action arises out of what is essentially a maritime tort, the law of maritime torts is particularly analogous to

---

1. Perhaps comparative causation is a conceptually more precise term than comparative fault "since fault alone without causation does not subject one to liability." *Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.,* 565 F.2d 1129, 1139 (9th Cir.1977); *see also Lewis v. Timco, Inc.,* 716 F.2d 1425, 1431 (5th Cir.1983) ("It is inevitable that a comparison of the conduct of plaintiffs and defendants ultimately be in terms of causation."); *Murray v. Fairbanks*

*Morse,* 610 F.2d 149, 159–60 (3d Cir.1979) ("the comparison itself must focus on the role each played in bringing about the particular injury."). But whether we use the term comparative fault or comparative causation, "we are merely beating around the semantical bush seeking to achieve an equitable method of allocating the responsibility for an injury or loss." *Pan-Alaska Fisheries,* 565 F.2d at 1139.

this case. In *Central Soya*, the court explained:

> Here ... we are confronted with an action seeking monetary damages arising from a wrongful act, which, according to the definition provided by Congress, is an action founded upon a tort. That the Rivers and Harbors Act was enacted pursuant to the Commerce Clause does not alter the fact that the Government's case essentially concerns a maritime tort—a suit for damages arising from the collision of a barge with a lock and dam—for which it now seeks money damages.
>
> \* \* \* \* \* \*
>
> That the Government's action for damages in this case is founded in "tort" is further exemplified by the fact that two of the basic policies underlying theories of tort liability are satisfied by the Government's suit: deterrence of harm-causing conduct and compensation for damages and injuries arising out of that conduct....

697 F.2d at 169 & n. 4 (citation omitted); *see also P/B STCO 213*, 569 F.Supp. at 744 (court noted that section 412 concerns the government's recovery of damages for a maritime tort).

Comparative fault is the admiralty rule in maritime collision and personal injury cases. Admiralty courts followed the equal division of damages rule in collision cases until 1975 when the Supreme Court overruled its prior decisions and adopted "pure" comparative fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). Finding that comparative fault is a more efficacious means of achieving a "just and equitable" apportionment of damages, the Court held that

> [W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is

not possible fairly to measure the comparative degree of their fault.

*Id.* Comparative fault is also applicable in personal injury actions under the Jones Act, 46 U.S.C. § 688, *see Theriot v. J. Ray McDermott & Co.*, 742 F.2d 877, 881 (5th Cir.1984), in actions for unseaworthiness under general maritime law, *see Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953); *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939); *Hlodan v. Ohio Barge Line, Inc.*, 611 F.2d 71, 74 (5th Cir.1980), and in strict products liability actions under general maritime law, *see Timco*, 716 F.2d at 1433; *Pan-Alaska Fisheries*, 565 F.2d at 1139; *Schaeffer v. Michigan-Ohio Navigation Co.*, 416 F.2d 217, 221 (6th Cir.1969).

Admiralty courts have encountered little difficulty in reconciling comparative fault and strict liability. Although unseaworthiness is "a species of liability without fault," *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946), a seaman's damages are always reduced in proportion to his contributory fault. *See Socony-Vacuum*, 305 U.S. at 429, 59 S.Ct. at 265; *Furka v. Great Lakes Dredge & Dock Co.*, 755 F.2d 1085, 1088 n. 4 (4th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 136, 88 L.Ed.2d 112 (1985); *Fontenot v. Teledyne Movible Offshore, Inc.*, 714 F.2d 17, 19 (5th Cir.1983); *Hlodan*, 611 F.2d at 74. The same was true of longshoremen until their action for unseaworthiness was abolished. *See Pope & Talbot*, 346 U.S. at 409, 74 S.Ct. at 204. Further, admiralty courts have uniformly applied comparative fault in maritime strict products liability cases. *Timco*, 716 F.2d at 1433; *Pan-Alaska Fisheries*, 565 F.2d at 1138–39; *Schaeffer*, 416 F.2d at 222.

The general principles of tort law developed outside of admiralty may also be relied upon in determining whether comparative fault is applicable in actions brought pursuant to section 412. *See Tug Colette Malloy*, 507 F.2d at 1022 & n. 1 (court looked to general principles of tort law to determine whether "garden-variety" contributory negligence is a defense in an action brought pursuant to section 412).

Outside of admiralty, courts and commentators have, with few exceptions, favored application of comparative fault in strict liability actions. *See, e.g., Austin v. Raybestos-Manhattan, Inc.,* 471 A.2d 280 (Me.1984); *Kaneko v. Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343 (1982); *Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978); *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42 (Alaska 1976); V. Schwartz, *Comparative Negligence* 195–209 (1974 & Supp.1981); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 850 (1973). Moreover, the Uniform Comparative Fault Act § 1 (1977) expressly provides for application of comparative fault in actions based upon strict or absolute liability.

Interpretations of a statute which produce inequitable and unreasonable results should be avoided when alternative interpretations consistent with the statute's language and objective are available. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982); *Payne v. Panama Canal Co.,* 607 F.2d 155, 164 (5th Cir.1979); *Virgin Islands v. Berry,* 604 F.2d 221, 225 (3d Cir.1979). The majority's interpretation of section 412 renders a private party liable for 100 percent of the damages sustained by the government even where the government is 100 percent at fault. Although the majority denies that it is suggesting that a vessel involved in damaging a river or harbor improvement must reimburse the government for the full amount of damages where the government was 100 percent at fault, the government conceded at oral argument that the interpretation of section 412 adopted by the majority would permit no other result.[2] In *Tug Colette Malloy,* the court expressly rejected this inequitable result, stating that "we have no doubt that if the tug had shown the gateman to be solely at fault in causing the accident a defense would have been estab-

lished." 507 F.2d at 1022; *see also Central Soya,* 697 F.2d at 169.

The unreasonableness of the majority's interpretation of section 412 is demonstrated by the fact that it encourages negligence by permitting the government to shift the costs of its negligence to non-negligent vessel owners in the form of damage awards against the owners of vessels involved in accidents and in the form of higher insurance premiums for other vessels that utilize river and harbor improvements. *Cf. Jones v. T.G. & Y. Stores Co.,* 775 F.2d 663, 665 (5th Cir.1985) (court reasoned that rejection of comparative fault would pervert and distort economic incentives and expenditures by allowing full recovery to a plaintiff who was 90 percent at fault); *Timco,* 716 F.2d at 1432 (court reasoned that rejection of comparative fault in strict products liability cases would relieve the user of any incentive to avoid accidents). The majority's interpretation accomplishes "the result, extraordinary in our jurisprudence, of a wrongdoer shifting the consequences of his negligence onto his victim." *Wyandotte Transportation,* 389 U.S. at 204, 88 S.Ct. at 387.

We do not suggest that this court may ignore the mandate of Congress whenever it finds a particular result unpalatable. It is simply our view that neither the language nor the objective of section 412 supports, let alone compels, the inequitable and unreasonable result reached by the majority in this case. Therefore, we would reverse the district court's allocation of damages to the lock and remand to the district court with instructions to assess fifty percent of the damage to the United States and fifty percent to Chotin.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge, concurring with Circuit Judge MILBURN'S dissent.

The United States, because of its agent's negligence, should be held liable for one-half of the damage to the lockgate which the Chotin barge train hit.

---

**2.** The majority suggests that this result may be avoided by interpreting section 412 as requiring a showing of negligence, in some degree, in order to impose liability. This suggestion flies

in the face of the very decisions upon which the majority rests its conclusion that section 412 does not permit application of comparative fault.

I feel that Justice Stewart's unanimous opinion for the Supreme Court in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), was and is correct, and that it requires the result reached by Judge Milburn's opinion, in which opinion I join.