**UNITED STATES of America, Plaintiff,**

v.

**The TUG REBEL, her engines, tackle, etc. and the Barges # 24333 and 31853, their tackle, appurtenances, etc., in rem,**

and

**Tidewater Barge Lines, Inc., in personam, Defendants.**

**Civ. No. 93–586–FR.**

United States District Court, D. Oregon.

May 11, 1995.

Frank W. Hunger, Asst. Atty. Gen., Kristine Olson Rogers, U.S. Atty., Portland, OR, Philip A. Berns, Atty. in Charge, West Coast Office, Warren A. Schneider, Asst. Atty. in Charge, Torts Branch, Civ. Div., U.S. Dept. of Justice, San Francisco, CA, for plaintiff.

Guy C. Stephenson, Schwabe, Williamson & Wyatt, Portland, OR, for defendants.

## AMENDED OPINION

FRYE, District Judge:

The matter before the court is the motion of the plaintiff for partial summary judgment (# 23).

### FACTS

On the afternoon of July 15, 1990—a clear and sunny day—a flotilla of barges propelled by the tug REBEL entered the navigational lock at the John Day Dam. At the front of the flotilla were two empty grain barges tied next to each other. Behind the starboard forward barge was a loaded petroleum barge; behind the petroleum barge was a derrick barge. In this configuration, the flotilla, not including the tug, was 636 feet from bow to stern. The tug REBEL was 87 feet in length.

The maximum length for a flotilla using the navigational lock at the John Day Dam is 650 feet. The upstream and downstream limits of the lock space are marked by yellow vertical lines painted on construction joints at either end of the lock. The distance between the yellow lines is 650 feet. The length of the navigational lock is 675.45 feet.

Because the flotilla was 723 feet long, Darrel McBride, the pilot who was operating the flotilla, knew that he would have to "knock-

out," i.e., once the barges were tied off in the lock, he would have to move the tug from its position astern the derrick barge to a position adjacent to that barge.

Pursuant to the standard procedures on the Columbia River, McBride "radioed" the John Day locks about half an hour prior to his anticipated arrival. During the conversation, McBride advised that he would be needing an up-river lockage, that he was "long" and would need to "knock-out."

When the flotilla reached the lock, the light was green, signifying that the flotilla could enter the lock. The deckhand, Danny Lee Burum, went to the bow of the starboard grain barge at the front of the flotilla to advise the pilot, who was in the wheelhouse, of his distance from the wingwall. This is standard procedure upon entry into the lock. There were two other crew members on board. However, since flotillas operate around the clock during the river transits, the crew members work shifts of six hours on duty and six hours off duty. Thus, the other two crew members were in their living quarters, apparently asleep, and had no involvement in the lockage or the incidents resulting in this litigation.

Again following standard procedure, once the flotilla had passed a corner on the wingwall of the lock chamber and thus had begun to enter the lock chamber, Burum walked aft to tie off the flotilla. He tied off the flotilla at floating bollard number 2 at the lock to the derrick barge. He then went back on board the tug in preparation for moving the tug adjacent to the derrick barge. He did not return to the forward barges to check their location relative to the yellow line marking the end of the 650–foot length of the lock space.

From his position in the wheelhouse of the tug, the pilot was unable to evaluate the position of the flotilla relative to the forward yellow stripe; thus, he had to adjudge his location by looking back to the rear yellow stripe. He did this prior to "knock-out" estimating that the stripe was about 30 feet back from the bow of the tug in its position astern of the derrick barge.

The pilot moved the tug adjacent to the derrick barge. At that point, he advised the lockmaster, John Brostowitz, that the flotilla was secure. The lockmaster received the communication. Burum then went below to do maintenance on the engine. McBride stayed in the wheelhouse.

On the day of the incident, Brostowitz, the lockmaster, was to follow a standard procedure for upstream lockage as follows: He was to wait at the downstream lockstand until he received a message from the tug pilot that the flotilla was secure. He was then to check the line from the flotilla to the cleat on the lock to see that it was taut. He was then to check the flotilla to see if it was forward of the downstream stripe. After doing that, he was to proceed to the upstream lockstand.

At the upstream lockstand, Brostowitz was to check to see that a second line was tied from the flotilla to a cleat and that the line was taut. He was also to check to see that the forward end of the flotilla was inside the upstream stripe. After having satisfied himself that the flotilla was positioned correctly, he was then to proceed with the lockage.

On this occasion, Brostowitz did not check to make sure that the forward end of the flotilla was inside the upstream stripe, and Brostowitz did not monitor the location of the flotilla during the lockage until it was too late to prevent the accident.

After Brostowitz commenced the fill, he remained in the upstream lockstand completing the log that shows the day's commercial lockages. This activity diverted his attention from the lockage until he looked up and noticed that the bows of the forward barges were coming up under the upstream gate.

In a panic, Brostowitz made a telephone call to the tug master telling him to back up. Within thirty seconds of the call, there were cracking noises, and parts of the upstream gate started to fly off. The push knees of the forward barge had come up under the upstream gate, jamming the gate and causing such damage to the upstream gate that it had to be replaced.

After the allision, Brostowitz volunteered for a drug and alcohol test. The results of

the drug and alcohol test were negative. The crewmembers involved also were tested for drugs and alcohol and no one tested positive for drugs and alcohol.

On May 17, 1993, the United States filed this action against the defendants, the Tug REBEL, the Barges, and Tidewater Barge Lines, Inc., seeking to recover for the damages to the upstream lock gate pursuant to the provisions of 33 U.S.C. §§ 408 and 409. The United States contends that under 33 U.S.C. § 411, the defendants are strictly liable to the United States for the damages to the upstream lock gate caused by the negligence of the defendants.

The defendants deny that they were negligent, arguing that the damage to the upstream lock gate was caused solely by the negligence of the lockmaster. In the alternative, the defendants argue that if they are found to be at fault in some respect, the fault for which they are liable in damages must be determined in accordance with the principles of comparative negligence.

The United States moves the court for an order of partial summary judgment on the grounds that the governing principles of Title 33 of the United States Code impose strict liability on the defendants and preclude the application of the principles of comparative negligence used in general maritime law.

The defendants contend that the damages to the lock gate were caused solely by the lockmaster. The defendants further contend that even if they are found to be strictly liable under Title 33, they are not absolutely liable, and the liability of the parties should be based upon comparative fault. Finally, the defendants argue that even if they are held strictly liable, the gross negligence of the lockmaster is a defense to the claim of the United States.

## APPLICABLE STANDARD

Summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## ANALYSIS

The plaintiff, the United States of America, seeks a ruling of the court that the doctrine of strict liability applies in this case, and the doctrine of comparative liability does not apply in this case. Strict liability "means liability that is imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care, i.e., actionable negligence." W. Prosser and W. Keeton, *The Law of Torts* § 75, at 534 (5th ed. 1984).

In *Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129 (9th Cir.1977), the United States Court of Appeals for the Ninth Circuit ruled that strict liability actions may be maintained in admiralty, but that the doctrine of comparative fault must be applied to suits in admiralty. The defendants argue that the reasoning adopted by the court in *Pan–Alaska Fisheries* applies with equal force to this case. In *Pan–Alaska Fisheries*, the court stated that:

"... a noted commentator has suggested that the proper interaction between strict liability and contributory negligence 'should be apparent on reflection. It is to apply a system of comparative fault of the "pure type" and apply it to strict liability as well as negligence.' Wade, Strict Tort Liability, 44 Miss.L.J. 825, 850 (1973)."

*Id.* at 1138 (quoting *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 290 (5th Cir. 1975).

Once the doctrine of strict products liability has been applied to admiralty, the adoption of the concept of comparative fault is especially easy since the doctrine is not new to admiralty, but has been applied in circumstances other than products cases.

Recently, the Supreme Court, in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1716, 44 L.Ed.2d 251 (1975), reconsidered the old admiralty rule of equally divided damages in collision

cases where both parties are at fault, and held that:

"... when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for *such damage is to be allocated among the parties proportionately to the comparative degree of their fault*, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault."

*Id.* (emphasis in original).

However, in an en banc decision in *Chotin Transp., Inc. v. United States*, 819 F.2d 1342 (6th Cir.1987), *cert. denied*, 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 371 (1987), the court ruled that the principles of comparative negligence which apply in an action pursuant to the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752, do not apply in allocating the liability of the parties for the damages caused to an upstream lift gate under the Rivers and Harbors Act. In *Chotin*, the United States Court of Appeals for the Sixth Circuit affirmed the finding of the district court that the vessel and the lockmaster were each 50% negligent in causing the collision between the barge and the upstream lift gate, but explained:

[B]ecause strict liability under 33 U.S.C. §§ 408 and 412 of the Rivers and Harbors Act arises from a violation of the above statutes and not from common law tort negligence, and because the trial court properly assessed 50% of the liability proximately contributing to the damage of the upstream lift gate of the Wilson Lock on the Tennessee River against Chotin [owner of the barge], it must, pursuant to the mandate of the statutory language, reimburse the government for the entire cost of the damage to the described lift gate.

819 F.2d at 1349.

The Court of Appeals in *Chotin* relied upon §§ 408 and 412 of the Rivers and Harbors Act, which provide, in pertinent part:

It shall not be lawful for any person or persons to ... alter, deface, destroy, move, injure ... or in any manner whatever impair the usefulness of any sea wall, bulk-head, jetty, dike, levee, wharf, pier, or other work built by the United States ... for the preservation and improvement of any of its navigable waters or to prevent floods....

33 U.S.C. § 408.

And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft ... and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof.

33 U.S.C. § 412.

In addition, the Court of Appeals in *Chotin* looked to the following rationale of the Seventh Circuit in *United States v. Ohio Valley Co.*, 510 F.2d 1184, 1188 (7th Cir.1975): "[T]he purpose of the combined effect of sections 14 and 16 [33 U.S.C. §§ 408 and 412] is to provide funds for the replacement and maintenance of improvements built by the United States. This purpose is implemented through an absolute liability standard."

Further, the Court of Appeals in *Chotin* noted that its decision to adopt a standard of absolute liability is in accord with decisions in *United States v. Ohio Valley Co.* and in *United States v. Federal Barge Lines, Inc.*, 573 F.2d 993 (8th Cir.1978).

The parties agree that there is no case from the United States Court of Appeals for the Ninth Circuit directly on point.

The United States urges the court to adopt the rationale of absolute liability stated by the Sixth Circuit in *Chotin*. The United States correctly relies upon the fact that the case relied upon by the defendants, *Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129 (9th Cir.1977), interpreting Section 402A of the Restatement (Second) of Torts, applies to the sellers of products, and that the case before this court deals with the Rivers and Harbors Act,

which is remedial legislation designed to prevent impediments to navigation.

The defendants urge the court to find that *Chotin* is not persuasive authority in the Ninth Circuit and to find that the doctrine of comparative liability applies to an action under the Rivers and Harbors Act in this circuit.

## CONCLUSION

This court adopts the reasoning of the *Chotin* court and the holding of the Courts of Appeals in the Sixth, Seventh and Eighth Circuits that preclude the application of the general provisions of comparative negligence to this action under the Rivers and Harbors Act.

The motion of the United States of America to grant partial summary judgment holding that the governing principles of Title 33 of the United States Code impose strict liability on the defendants herein, thus precluding the application of the comparative negligence provisions of general maritime law (# 23) is granted. The court declines to address any issues not heretofore raised by motion.